**UNITED STATES of America,**

**v.**

**Lamar Eric THOMAS aka Lamar A. Thomas aka "Marquis" aka "Quis" aka Marquis Eric State aka Eric Derick Stayton Lamar Eric Thomas, Appellant.**

**No. 02–2770.**

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit LAR 34.1(a) Jan. 22, 2003.

Decided Feb. 4, 2003.

Before BECKER, NYGAARD, and AMBRO, Circuit Judges.

OPINION

AMBRO, Circuit Judge.

Appellant Lamar Eric Thomas pleaded guilty in March 2002 to one count of possession with intent to distribute less than five grams of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). He was sentenced to sixty-eight months imprisonment followed by three years supervised release. Thomas appeals two issues related to the District Court's denial of his motions to suppress evidence: whether the Court erred in concluding that officers' initial stop of Thomas constituted a permissible investigatory detention and not an arrest; and whether it erred in refusing to order the Government to disclose the identity of a confidential informant. We have jurisdiction pursuant to 28 U.S.C. § 1291, and shall affirm.

I.

On the afternoon of November 5, 2001, Sergeant Michael Nolan of the Erie Police Department received a call from a confidential informant who had provided information to Nolan on multiple prior occasions. The informant told Nolan that "Speedy" Stepp intended to shoot a man named Beason (one of several in the area) in retaliation for stealing drugs. The informant, calling from a cellular telephone, stated that he currently was observing

Stepp walking in "the Hood"—an area of Erie known for its high incidence of violent drug-related activity—while openly holding a gun and looking for Beason. The informant excitedly told Nolan that Stepp had been joined in the street by Thomas, that a confrontation was imminent, and that police were needed on the scene immediately.

Nolan called the police radio dispatcher, who advised all officers in the area that a shooting was about to occur. En route, officers in a patrol car passed another car driven by one of the Beasons, who pointed frantically behind him toward the area he had just driven from, the same area where the informant said Stepp and Thomas were located. Five police officers arrived at the designated intersection (two cars with two officers each and one officer on a bicycle patrol), and encountered three men: Stepp, Thomas, and Robert Tarver. The officers drew their weapons and told the men to stop, put their hands in the air, and get on the ground. Stepp and Tarver immediately complied, but Thomas continued to walk toward the officers. Thomas partially raised his right hand, but repeatedly dropped it to his side. Thomas eventually got down, but kept dropping his right hand. Concerned that Thomas may be reaching for a concealed weapon, one officer decided to pat Thomas down. As the officer knelt over Thomas, his knee felt a metal object in Thomas's back pocket. The officer reached inside the pocket and withdrew a loaded handgun. The other two suspects were patted down as well, but no additional weapons were found. Thomas and Stepp were arrested and brought to the police station.

At the station, Nolan again patted down Thomas. Nolan had arrested Thomas only two months before and during a pat down at that time discovered that Thomas had hidden a plastic bag with crack cocaine in his buttocks. During this later pat down of Thomas, Nolan felt Thomas clench his legs and buttocks. Nolan ordered Thomas to expose his buttocks, and Thomas reached behind himself and removed a plastic bag containing crack cocaine.

At trial Thomas moved to suppress the crack cocaine and to reveal the identity of the confidential informant. The District Court denied both motions. Thomas then entered a conditional guilty plea, reserving the right to appeal these rulings.

II.

Thomas argues that his initial encounter with the police amounted to an arrest, not an investigatory stop, as found by the District Court. The latter, known as a *Terry* stop, requires only that the police have a reasonable suspicion based on articulable facts that a crime has been committed, *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), whereas the arrest of a suspect requires that the police have probable cause to do so, a more stringent standard. *Baker v. Monroe Township,* 50 F.3d 1186, 1192 (3d Cir.1995). We review the District Court's factual findings as to the circumstances of the officers' stop and pat down of Thomas for clear error, and exercise plenary review of the District Court's conclusion that the police conduct did not constitute a *de facto* arrest. *See United States v. Edwards,* 53 F.3d 616, 618 (3d Cir.1995). Because we agree with the District Court that the officers' actions did not transform the *Terry* stop into an arrest, it is unnecessary for us to consider whether there was probable cause. *See id.* at 619.

When making an investigatory stop, police officers "may take such steps as are 'reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.'" *Id.* (quoting *United States v. Hensley,* 469 U.S. 221,

235, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985)). "Under the *Terry* cases, the reasonableness of the intrusion is the touchstone, balancing the need of law enforcement officials against the burden on the affected citizens and considering the relation of the policeman's actions to his reason for stopping the suspect." *Id.* (quoting *Baker,* 50 F.3d at 1192). Relevant to the specific context of this case is our prior acknowledgment that "[t]here is no per se rule that pointing guns at people, or handcuffing them, constitutes an arrest." *Baker,* 50 F.3d at 1193 (citing cases). The "use of guns and handcuffs must be justified by the circumstances," however, and "we must look at the intrusiveness of all aspects of the incident in the aggregate." *Id.*

Thomas concedes that no single police action—*e.g.,* pointing weapons at him, ordering him to the ground, handcuffing him—is dispositive to demonstrate unreasonableness. Instead he argues that, in combination, the officers' conduct went far beyond what was necessary to protect their safety and maintain the *status quo.* This is especially so, contends Thomas, because the officers' response was based solely upon the unreliable information of a confidential informant. For example, the informant had told Nolan that Stepp was walking around the Hood while openly carrying a gun, yet no gun was observed by the officers upon arrival.

We are unpersuaded. Factors that may justify an investigative stop to search for weapons "include the time of day, the 'high-crime' nature of the area, an informant's tips that persons might be armed, furtive hand movements, flight or attempted flight by the person sought to be detained, and a pressing need for immediate action." *United States v. Laing,* 889 F.2d 281, 286 (D.C. Cir.1989) (citing *Adams v. Williams,* 407 U.S. 143, 147–48, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)). Here, a confidential informant that Erie police had relied on in the past called Nolan and stated that he currently was observing a man brandishing a gun while walking through an area known for its high incidence of violent drug activity. The informant told the police that he believed a murder was about to occur. Police driving to the scene to investigate passed the intended victim, who motioned frantically to the area where the informant said the suspects were located. Upon arrival, Thomas alone did not heed police commands to stop walking. He refused to raise his hands, and made gestures that could be interpreted as reaching for a weapon. We have no doubt that the officers' actions, viewed individually or collectively, were reasonably necessary to protect their personal safety and maintain the *status quo.* Accordingly, we hold that the stop and pat down of Thomas did not rise to the level of an arrest.

III.

■ Thomas's second argument on appeal involves the District Court's denial of his motion to disclose the identity of the confidential informant, a decision we review for an abuse of discretion. *See United States v. Brown,* 3 F.3d 673, 679 (3d Cir.1993). The Supreme Court in *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), explained the standard for determining whether an informant's identity should be revealed. "[P]rotecting an informant's identity serves important law enforcement objectives, most significantly, the public interest in encouraging persons to supply the government with information concerning crimes." *Brown,* 3 F.3d at 679 (citing *Roviaro,* 353 U.S. at 59). The Government's privilege to withhold disclosure is not limitless, however. "Where the disclosure of an informer's identity, or of the

contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *United States v. Jiles,* 658 F.2d 194, 196 (3d Cir.1981) (quoting *Roviaro,* 353 U.S. at 60–61).

Thus we are to apply a balancing test to weigh these competing considerations. "[O]nce a defendant sets forth a specific need for disclosure the court should balance 'the public interest in protecting the flow of information against the individual's right to prepare his defense.' " *Id.* (quoting *Roviaro,* 353 U.S. at 62). The inquiry is case specific, "taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Id.* (quoting *Roviaro,* 353 U.S. at 62).

Examining those factors here, we conclude that Thomas has not shown a specific need for disclosure that outweighs the public interest in allowing informants to remain confidential. As an initial matter, we note (as did the District Court) that the Supreme Court has indicated that a defendant's need to learn the identity of an informant is less compelling in a pretrial suppression hearing than at trial. *See McCray v. Illinois,* 386 U.S. 300, 312, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967). In this specific context, moreover, the significance of the informant's testimony to Thomas's ability to prepare his defense was quite limited.

Thomas's asserted need for disclosure is that the information provided by the informant was not corroborated by Nolan or anyone else. Thomas thus argues it is crucial that he be permitted to probe the informant's basis of knowledge and veracity. The District Court found, and we agree, that there is nothing for Thomas to gain by cross-examining the informant on his statements that led to the *Terry* stop. Although the arrest after the stop and pat down revealed that he was carrying a gun, the charge on which Thomas ultimately was prosecuted—possession with intent to distribute crack cocaine—resulted from the seizure at the Erie police station. The informant provided no information that Thomas had secreted illegal drugs on his person, nor was the informant present at the station when Nolan made this discovery. In other words, the informant was not, as Thomas asserts, the one person responsible for his arrest and prosecution.

Furthermore, even assuming that Thomas had established a pressing need for access to the informant's identity, the District Court found credible both the informant's reliability and concern for his safety should his identity be disclosed. Thomas provides no persuasive reason to disturb this conclusion. We therefore hold that the District Court did not abuse its discretion in denying Thomas's motion to reveal the confidential informant's identity.

III.

For the reasons stated, we shall affirm the judgment of the District Court.