

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-27-2008

# USA v. Holyfield

Precedential or Non-Precedential: Non-Precedential

Docket No. 06-1250

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"USA v. Holyfield" (2008). *2008 Decisions.* Paper 1521.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/1521

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 06-1250
_____

UNITED STATES OF AMERICA

vs.

CEDANO HOLYFIELD

Appellant.

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Criminal No. 04-cr-00035-1)
District Judge:  The Honorable Thomas M. Hardiman

_____

ARGUED  November 1, 2007


BEFORE: RENDELL, WEIS, and NYGAARD, Circuit Judges.


(Filed: February 27, 2008)

Karen S. Gerlach, Esq.
Renee Pietropaolo, Esq.(Argued)
Office of the Federal Public Defender
1001 Liberty Avenue
1450 Liberty Center
Pittsburgh, PA 15222
        Counsel for Appellant


Robert L. Eberhardt, Esq.

Laura S. Irwin, Esq. (Argued)
Office of the United States Attorney
700 Grant Street, Suite 4000
Pittsburgh, PA 15219
    Counsel for Appellee

_____

OPINION OF THE COURT
_____

NYGAARD, Circuit Judge.

I.

Cedrano Holyfield pleaded guilty to three counts of a four-count indictment alleging various criminal charges stemming from a drug sale. His plea was conditional, retaining the right to appeal the following issue: "Whether the District Court erred in refusing to suppress the evidence seized from the car in which he was a passenger or from his person." For the reasons that follow, we will affirm.

II.

Early one afternoon, Pittsburgh Police Detective Covington was conducting surveillance of Lakeesha Harris in the parking lot of a Sunoco gas station. Detective Covington was well-acquainted with Ms. Harris, having personally arrested her several times for drug-related crimes. Harris was sitting in the driver's seat of her vehicle, which was parked by the air pump with the hood up. Detective Covington was in an unmarked vehicle parked a car-length or more away from Harris' car. Detective Covington was supported by a "take-down team," which consisted of Detectives Wydra and Klahre and

Officer Epler, who remained in an unmarked vehicle parked in an alley behind the station. Four other officers were also parked in two squad cars a short distance from the station. Detective Covington communicated his observations to the take-down team via two-way radio.[1]

Detective Covington observed Harris for approximately 45 minutes, during which time she remained in her vehicle but made several calls on her cellular phone. During this time, no one approached the vehicle to talk to Harris. After 45 minutes, a dark blue Honda pulled into the Sunoco parking lot, driven by Holyfield. Holyfield was accompanied by one passenger. Holyfield parked the Honda and walked toward Harris' Ford. Detective Covington observed large bulges in each of Holyfield's pockets. Holyfield then got into the front passenger seat of Harris' vehicle and engaged in a brief conversation with her which Detective Covington was unable to hear. Holyfield next reached into his pocket with his left hand and pulled out a large plastic shopping bag. Detective Covington described each of these actions to the take-down team in "play-by-play" fashion.

---

[1] The authorities' presence at the Sunoco station resulted from an anonymous tip that Lakeesha Harris would be purchasing a large quantity of crack cocaine. The Government conceded at oral argument that the anonymous tip could not serve as sufficient probable cause or reasonable suspicion to search or seize the Defendant. We agree. Reasonable suspicion is predicated exclusively upon what Detective Covington and the other officers witnessed while in a public place where they had an unquestionable right to be.

Believing that a drug deal was taking place, Detective Covington called in the take-down team. Within approximately ten seconds, Officer Epler and the other detectives arrived at the Sunoco in their unmarked vehicle, accompanied by uniformed police officers in squad cars. Sergeant Epler and Detective Wydra approached Harris' vehicle on foot. Sergeant Epler had his gun drawn, and Detective Wydra yelled "Pittsburgh Police!" while displaying his badge. Upon seeing the take-down team approach, Holyfield tossed the plastic shopping bag onto the rear seat of Harris' vehicle.[2] Detective Covington informed the take-down team that Holyfield tossed the bag. Sergeant Epler approached the driver's side of Harris' vehicle and saw a gray plastic "Family Dollar" shopping bag sitting on the rear seat. The bag was partially open and Sergeant Epler could see a smaller baggie containing a small chunk of crack cocaine protruding. After Sergeant Epler informed Detective Wydra that crack cocaine was in the back seat of Harris' vehicle, Detective Wydra ordered Holyfield out of the vehicle, handcuffed him, and searched him. He found a .40 caliber Glock semi-automatic pistol in Holyfield's right front pocket. Sergeant Epler recovered the large shopping bag and discovered that it

---

[2] Although the Government contends that the officers had not left their vehicle when Holyfield threw the bag onto the back seat, the record is ambiguous on this point. Detective Covington testified, "[t]hey [the officers] were in the parking lot. He saw them coming, then he tossed the bag. I don't know exactly how far they were to their car. But he didn't toss the bag until he saw them coming." (R. 67). Sergeant Epler could not remember how the bag got into the back seat. (R. 75). Detective Wydra testified that when approaching the vehicle on foot he was aware through a radio transmission that a bag had been thrown onto the rear seat, but did not specify exactly when that radio transmission was received. (R. 78).

contained four baggies of crack cocaine. The detectives then asked Holyfield if he would consent to the search of his Honda. He refused, saying that there wasn't anything in the car and that the car "did not have anything to do with it." Holyfield later said, "I don't care if y'all search, but y'all have to get consent from Chaz," the passenger in Holyfield's car whose real name is Charles Coleman.

## III.

In addressing whether an unconstitutional seizure occurred, we apply the clear error standard with respect to the factual findings.[3] *See  United States v. Kiam,* 432 F.3d 524, 527 (3d Cir.2006).  With respect to the ultimate legal question of whether a seizure occurred, we exercise plenary review. Although our standard of review is plenary, we are mindful that a district court is always at an institutional advantage in reviewing a *Terry*-stop because it has observed the testimony of witnesses and has a particular understanding of local conditions and situations when making its determination.  *See Ornelas v. United States*, 517 U.S. 690, 698 (1996).

## IV.

---

[3]   Holyfield devotes a large part of his brief to contesting the District Court's findings of fact.  Throughout his brief, Holyfield challenges what he perceives to be "factual errors" of the District Court.  As we have indicated, on an appeal of a district court's denial of a motion to suppress, we review the court's finding of the underlying facts for clear error and accord plenary review to its application of the law to those facts. *See United States v. Givan*, 320 F.3d 452, 458 (3d Cir.2003).  We have found no clear error in the District Court's factual findings. The District Court explained the basis for these findings thoroughly, and they are well supported in the record.

Holyfield raises three arguments on appeal: first, he maintains that what began as a *Terry*-stop escalated into a *de facto* arrest for which probable cause was lacking; second, that there was no probable cause for the *Terry*-stop in the first place; and finally, that because his stop and arrest violated the Fourth Amendment to the Constitution, all the evidence thereby gained should have been suppressed by the District Court. We first review Holyfield's contention that the police had insufficient information to support the investigatory stop.

A.

The Fourth Amendment permits the police to conduct "a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). To determine whether the circumstances support an investigatory stop, we take into account the "totality of the circumstances — the whole picture." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). Under this approach, "even factors independently 'susceptible to innocent explanation' can collectively amount to reasonable suspicion." *United States v. Brown*, 448 F.3d 239, 252 (3d Cir. 2006). Also, police officers may rely on "their own experience and specialized training to make inferences from and deductions about the cumulative information available to them, that 'might well elude an untrained person.'" *United States v. Arizu*, 534 U.S. 266, 273 (2000).

Under this standard, we hold that the District Court properly determined that the police had sufficient information to justify the investigatory stop at issue here. The reasonable suspicion was based on Detective Covington's observations of Harris, whom he knew to have been involved in drug rings, giving the illusion of car trouble at the gas station but making no effort to fix her car or the situation. Detective Covington also observed Holyfield approaching Harris' car with "bulging pockets." Further, instead of making an attempt to help with the car, or walking up to the driver's side of Harris' car, Detective Covington watched as Holyfield went directly into the front passenger seat; and, after a brief conversation, he pulled a large shopping bag from his bulging pocket. The District Court concluded that, "[i]n light of [the detective's] personal knowledge of Harris' drug-trafficking history, the dubious nature of her car trouble, and Holyfield's conduct, the reasonable observer sitting in [the detective's] position would conclude that 'criminal activity may be afoot.' Accordingly, [the detective] was justified in ordering the take-down team to enter the gas station." District Court opinion at A6 (citation omitted).

We agree. The totality of the circumstances here show that Detective Covington did possess reasonable cause to believe that criminal activity might be happening. Many of the factors typically used to justify a *Terry*-stop are present here. For example, Harris' and Holyfield's conduct conformed to criminal profiles. Although Holyfield maintains that neither he nor Harris acted "nervous or evasive," their actions speak otherwise.

Holyfield threw the bag of drugs into the back seat of the vehicle as officers approached, and Harris exited the vehicle and attempted to escape. Detective Covington was accompanied by four other officers when he confronted Harris and Holyfield, and there is no evidence that the site of the confrontation was poorly lit --- indeed it was in the middle of the day. Most importantly, though, Detective Covington saw bulges in Holyfield's clothing that could suggest that he was carrying drugs. While on its own, "bulges" in someone's pants cannot create a reasonable suspicion, it can be considered in conjunction with other factors under the totality of the circumstances. *See e.g. United States v. Linkous*, 285 F.3d 716, 720-21 (8th Cir. 2002) (reasonable suspicion established due to, *inter alia*, bulge in pants).

Finally, we note that the police officers were at that particular location because of an anonymous tip. The contents of this tip are not part of the record but the existence of the tip is. Although the District Court did not factor the tip's contents into its reasonable suspicion analysis, the existence of the tip itself is part of the totality of the circumstances surrounding Holyfield's arrest, and explains the officers' presence at and surveillance of the gas station.

When viewed through the prism of these officers' experience, the totality of the circumstances raised reasonable suspicion that the Appellant was engaging in criminal activity. *See Cortez*, 449 U.S. at 417-18. It was not necessary for the police to have reason to believe Holyfield had drugs in his car. It was sufficient that they had a reasonable

suspicion that he was currently involved in illegal drug transactions in Harris' car.  We find no error in the District Court's conclusion.

B.

Next, we turn to Holyfield's argument that the police officers' actions in detaining him amounted to a *de facto* arrest for which they lacked probable cause.  Although we find his argument meritless, we recognize that the line between a proper *Terry* stop and an improper *de facto* arrest is elusive and not easily drawn. *See United States v. Sharpe*, 470 U.S. 675, 685 (1985).

In considering whether a stop is "so minimally intrusive as to be justifiable on reasonable suspicion," *id.* (quoting *United States v. Place*, 462 U.S. 696, 709 (1983)), we consider the duration of the stop, the law enforcement purposes justifying the stop, whether the police diligently sought to carry out those purposes given the circumstances, and alternative means by which the police could have served their purposes. *Id.* at 684-87. In determining whether a person has been "seized" for the purposes of the Fourth Amendment, the Supreme Court has instructed that: "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). *See also Florida v. Bostick*, 501 U.S. 429, 435 (1991) ("When police attempt to question a person who is walking down the street or through an airport lobby, it makes sense to inquire whether a

Page -9-

reasonable person would feel free to continue walking."). Here, we think it fair to conclude that a reasonable person in Holyfield's position would not have felt free to leave. That belief, however, does not negate a conclusion that Holyfield was being detained for a *Terry*-search instead of being actually arrested. As we have explained, a suspect is not free to leave during a Terry-stop just as he or she is not free to leave once arrested. *United States v. Edwards*, 53 F.3d 616, 619-20 (3d Cir. 1995).

We have also taken into consideration the locale of the encounter, *United States v. Lockett*, 406 F.3d 207, 211 (3d Cir. 2005), whether the officers controlled or blocked the person's movement, *id.*, whether the encounter involved physical force or show of authority; *Williams*, 413 F.3d at 352; and the length of the detention, *Edwards*, 53 F.3d at 620. We construe the record in the light most favorable to the Government. *United States v. Riddick*, 156 F.3d 505, 509 (3d Cir. 1998).

Under an objective standard of reasonableness, the police did not subject Holyfield to a de facto arrest. When making an investigatory stop, police officers "may take such steps as are 'reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.'" *Edwards*, 53 F.3d at 618 (quoting *United States v. Hensley*, 469 U.S. 221, 235, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985)). "Under the *Terry* cases, the reasonableness of the intrusion is the touchstone, balancing the need of law enforcement officials against the burden on the affected citizens and considering the relation of the policeman's actions to his reason for stopping the suspect." *Id.* (quoting

*Baker*, 50 F.3d at 1192). Relevant to the specific context of this case is our prior acknowledgment that "[t]here is no per se rule that pointing guns at people, or handcuffing them, constitutes an arrest." *Baker*, 50 F.3d at 1193 (citing cases). The "use of guns and handcuffs must be justified by the circumstances," however, and "we must look at the intrusiveness of all aspects of the incident in the aggregate." *Id.*

The encounter at issue here took place in an open area, during day light hours — as was the case in *Lockett*, *supra*., 406 F.3d at 211. Further, the record does not show that police blocked Harris' car (in which Holyfield sat as a passenger). The record only indicates that other officers arrived in their vehicles, but does not indicate that Harris's vehicle was blocked or trapped. And, even if they had blocked the car's egress, the police may still conduct an investigatory stop by blocking a vehicle in which the criminal suspect is riding, and may approach the vehicle with weapons at the ready on a reasonable suspicion that its occupants are armed. *See e.g. United States v. Jackson*, 918 F.2d 236, 238 (1st Cir.1990). Further, no direct physical force was used against Holyfield. Additionally, the fact that the police officers had their guns drawn does not convert this stop into a de facto arrest. *See Baker*, 50 F.3d at 1193.

Second, There is nothing in the record to indicate that the police delayed in acting or subjected Holyfield to any duration of time that might raise appropriate questions about the duration of the Terry-stop. Nor is there any indication that Holyfield was detained for any longer period of time than was necessary to allow the officers to perform a careful

check to satisfy themselves that there was no danger from accessible weapons and to "confirm or dispel their suspicions quickly." *See United States v. Sharpe*, 470 U.S. 675, 682 (1985). Moreover, this is not a case in which a significant period of time elapsed between the initial stop of the car and the discovery of contraband. *Cf. United States v. Sowers*, 136 F.3d 24, 28 (1st Cir. 1998) ("Even though at least thirty minutes elapsed between the time of the stop and the discovery of what appeared to be contraband, we see no basis for disrupting the district court's founded conclusion that no de facto arrest transpired.").

Under these circumstances, we cannot say that the District Court erred by concluding that a reasonable person, standing in Holyfield's shoes, would have understood that he was being briefly detained for inquiry and investigation, not arrested. *See Berkemer v. McCarty,* 468 U.S. 420 (1984). Several aspects of the initial stop support the District Court's conclusion. First, at no time before the drugs and weapons were discovered was Holyfield placed in handcuffs. Second, there is no evidence that Holyfield was treated harshly by the officers or physically handled beyond the limited pat-frisk officers conducted immediately after Holyfield was removed from the car. Third, none of the officers told Holyfield that he was under arrest until after the contraband was seized. Finally, all of the events-including the search of the car and the interrogation of its occupants-took place on a public street — indeed at a public gas station. The totality of

the circumstances demonstrates that there was a valid *Terry*-stop. The District Court did not err by denying Holyfield's motion to suppress the evidence.

C.

As a final argument, Holyfield argues that the police lacked probable cause to arrest him. Therefore, he argues, all evidence and statements obtained or derived from the initial arrest and stop should have been suppressed. This argument is meritless. The officers possessed a reasonable suspicion of criminal activity sufficient to justify a *Terry*-stop of Holyfield. After executing this investigatory stop, the officers had probable cause to arrest Holyfield based on Harris' questionable behavior; the bulges in Holyfield's pockets, Holyfield's behavior in approaching Harris' car (not acting like he was there to help with her car trouble, but proceeding directly into the passenger seat), Holyfield's removal of a bulge from his pocket, and then – as the officers approached – throwing the bag into the back seat, Harris' fleeing the scene, and Officer Epler's plain view observation of the crack cocaine in the back seat of the car.

Particularly noteworthy is that the crack cocaine was in plain view. Our decision in *United States v. Menon*, 24 F.3d 550, 559 (3d Cir. 1994) is controlling. In *Menon*, we set forth three requirements for plain view seizures. First, the officer must not have violated the Fourth Amendment in arriving at the place where the evidence was in plain view. Officer Epler – who discovered the evidence – was lawfully present at the gas station.

Second, the incriminating character of the evidence must be "immediately apparent. *Id*. Epler testified that he immediately believed the clear bag he saw in the back seat of Harris' car to contain crack cocaine. The District Court found him credible and Holyfield does not challenge this credibility determination. Therefore, the officer correctly determined the crack cocaine to be immediately incriminating based on his knowledge and experience. There is no error here either.

Finally, we instructed that the officer must have a lawful right of access to the object itself. *Id*. There is no real difficulty here – the crack cocaine was in plain view, right in front of the officer on the back seat of the car. The vehicle was parked in a public place at the time the drugs were observed as well. Neither was any expectation of privacy on Holyfield's part violated by the officer's actions. As the Supreme Court has instructed, "plain view doctrine is grounded on the proposition that once police are lawfully in a position to observe an item, its owner's privacy interest in that item is diminished." *Illinois v. Andreas*, 463 U.S. 765, 771 (1983).

V.

There is ample evidence here to support the District Court's denial of the motion to suppress and we will affirm the District Court's determination.

RENDELL, Circuit Judge, dissenting.

I respectfully disagree with the majority's reasoning that the initial stop here was lawful because the officers had a "reasonable, articulable suspicion that criminal activity [was] afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). I suggest the facts do not support that finding.

First, as to the "tip," the majority is wrong when it says that the existence of the tip can be considered, even though the Government, Holyfield, and the District Court agreed at trial that it was not to be factored into the equation. It cannot be both considered and not considered. It should not be considered *at all*.[4]

Second, the references to Harris' "drug-trafficking history" and to her "involve[ment] in drug rings" misstate the paltry record on this point. Detective Covington's only testimony on the issue was that he knew that Harris had a "drug history" and that he had arrested her approximately three times for unspecified misconduct. [App. 102, 112.] The testimony reveals nothing more.

Lastly, the time of Harris' flight and the time of Holyfield's throwing the bag into the backseat are unclear, but both appear to have occurred as the police were already in the process of descending on the scene, exiting two cars with at least one gun drawn.

---

[4] If anything, the Government's withdrawal of the tip from consideration equates to its being found to be unreliable and therefore clearly off limits for our reasonable suspicion analysis. *See, e.g., Florida v. J.L.*, 529 U.S. 266 (2000); *United States v. Brown*, 448 F.3d 239 (3d Cir. 2006).

From the innocuous facts adduced, a reasonable officer could just as easily conclude that Holyfield was bringing Harris her lunch. (I note that I do not fault Harris for making calls rather than looking under the hood and attempting to fix her car. I would probably have been sitting in the car, just like her, awaiting some assistance.) The facts fall far short of providing a reasonable, articulable suspicion of criminal activity. I would REVERSE the denial of the suppression motion and REMAND.

_____